1  Elizabeth J. Cabraser, No. 083151 (ecabraser@lchb.com)
   Heather A. Foster, No. 184353 (hfoster@lchb.com)
2  Kent Klaudt, No. 183903 (kklaudt@lchb.com)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
3  Embarcadero Center West
   275 Battery Street, 30th Floor
4  San Francisco, California  94111-3339
   Telephone:  (415) 956-1000
5  Facsimile:  (415) 956-1008

6  Steven E. Fineman, No. SF8481 (sfineman@lchb.com)
   Nicholas R. Diamand, No. ND9701 (ndiamand@lchb.com)
7  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   780 Third Avenue
8  New York, NY 10017
   Telephone:  (212) 355-9500
9  Facsimile:  (212) 355-9592
   Attorneys for Plaintiff LELIA INES BESSONE DE CASTRO

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13

14  LELIA INES BESSONE DE CASTRO,        Case No.   C 07 4418
    individually, and as Personal
15  Representative of and as Successor in   COMPLAINT FOR DAMAGES AND
    Interest to the Estate of the Decedent  INJUNCTIVE RELIEF:
16  FABIAN ADOLFO CASTRO,
                                           (1) NEGLIGENCE    MEJ
17  Plaintiff,                                 (SURVIVAL ACTION)

18  v.                                     (2) NEGLIGENCE PER SE
                                               (SURVIVAL ACTION)
19  ALPHA THERAPEUTIC
    CORPORATION, A California              (3) FRAUDULENT OMISSION AND
20  corporation, BAYER CORPORATION, an         CONCEALMENT
    Indiana Corporation; BAXTER               (SURVIVAL ACTION)
21  HEALTHCARE CORPORATION, a
    Delaware corporation, and its HYLAND   (4) BREACH OF IMPLIED WARRANTY
22  DIVISION; ARMOUR                           (SURVIVAL ACTION)
    PHARMACEUTICAL COMPANY, INC.,
23  a Delaware corporation, and AVENTIS    (5) WRONGFUL DEATH
    INC., a Pennsylvania corporation,
24                                         DEMAND FOR JURY TRIAL
    Defendants.
25

26  I.    **INTRODUCTION**

27         1.    Plaintiff's claims arise out of the most egregious misconduct in the history

28  of the pharmaceutical industry, which resulted in the killing of thousands of hemophiliacs

    worldwide, with a continuing death rate of hundreds of victims per year.  Defendants are

American corporations which manufactured blood products known as "Factor VIII" and "Factor IX" for the treatment of hemophilia, and sold these products to hemophiliacs worldwide, despite knowledge that the products were manufactured from sick, high risk donors and/or known to be contaminated with the viruses that cause AIDS and Hepatitis C (now known as HIV and HCV respectively). Defendants continued selling these products to hemophiliacs abroad even after the products were no longer being used in the United States due to the known risk of AIDS and Hepatitis C transmission, and continued selling old stocks of products they knew to be contaminated with HCV both in the United States and abroad even after they had introduced a safer product. Decedent Fabian Adolfo Castro was a hemophiliac who contracted HIV and Hepatitis C through use of Defendants' contaminated products.

2.    Defendants manufactured HIV and HCV-contaminated blood factor products at plants in the United States using human plasma taken from thousands of paid American donors, including populations then known to be at high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous drug users. Defendants intentionally recruited urban homosexuals who had a history of viral hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite knowledge that the viruses that cause AIDS and Hepatitis C were blood-borne diseases prevalent in such populations. Defendants continued using plasma taken from high risk prison donors, including from prisoners at the notorious Angola prison in Louisiana, even after promising the FDA that they would cease doing so. Through their trade associations, Defendants actively conspired to conceal these practices and to substantially delay product recalls and implementation of safety measures.

3.    Defendants failed to fully and completely disclose the known risks of their products, including the risk of AIDS and Hepatitis C; failed to implement readily available screening tests that would have prevented AIDS and Hepatitis C by excluding contaminated plasma; failed to use available methods of treating plasma to kill viruses, including heat treatment and solvent detergent; and concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused by the products. Defendants continued to ship non-heat treated product overseas even after ceasing to sell it in the United States, in order to maintain their profit

1   margin on existing contracts and sell off remaining stock no longer marketable domestically.

2   Defendants also continued to sell old stocks of product that had not been treated with detergent

3   both in the United States and abroad, even after introducing a safer product treated with detergent.

4       4.    Defendants' efforts to maximize profits came at the expense of the health

5   and lives of thousands of hemophiliacs worldwide who were needlessly infected with HIV and/or

6   HCV. AIDS is the leading cause of death for hemophiliacs who were treated with factor

7   concentrate in the 1980's, and the average life expectancy of hemophiliacs has decreased

8   substantially. As of 1992, Defendants' contaminated blood products had infected at least 5,000

9   European hemophiliacs with HIV, of which 2,040 had already developed AIDS and 1,250 had

10  died from the disease. In the United Kingdom, 34% of hemophiliacs tested positive for HIV in

11  1992. As of the mid-1990's in Japan, hemophiliacs accounted for the majority of Japan's 4,000

12  reported cases of HIV infection, and virtually all infections of Japanese hemophiliacs have been

13  linked to contaminated blood products imported from the United States. In Hong Kong and

14  Taiwan, over one hundred hemophiliacs were infected with HIV by Defendant CUTTER's

15  products alone. In Latin America, at least 700 HIV cases are linked to use of contaminated blood

16  products by hemophiliacs. Thousands more around the world were infected with Hepatitis C

17  from Defendants' products.

18  **II.    JURISDICTION AND VENUE**

19      5.    Plaintiff alleges an amount in controversy in excess of $75,000, exclusive

20  of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

21  because there is complete diversity of citizenship between the Plaintiff and the Defendants.

22      6.    Plaintiff is informed and believes and upon such information and belief

23  alleges that the unlawful, negligent and/or tortious activity alleged herein was carried out

24  predominantly in the United States. Defendants recruited high risk paid donors in the United

25  States and mixed plasma from such donors into the blood pool at their facilities in the United

26  States. Defendants placed misleading labels on their products in the United States and made

27  affirmative misrepresentations regarding their products' safety in the United States, which were

28  relied upon by Decedent and his doctors worldwide. Defendants' decisions to recruit paid donors

1   from high risk populations, to refrain from disclosing the known risks of their products, to forego

2   implementing readily available procedures that would have prevented their products from

3   transmitting AIDS, and to ship their products overseas even after they could no longer be used

4   domestically were all made in the United States. Defendants' acts of conspiracy, including trade

5   association meetings where they agreed to engage in wrongful conduct, also took place in the

6   United States.

7        7.    Plaintiff is informed and believes and upon such information and belief

8   alleges that the vast majority of the evidence of the unlawful activity alleged herein is located in

9   the United States. Documents showing Defendants' policies, practices, and decisions regarding

10  recruitment of plasma donors, mixing of plasma into the blood pool at their facilities, labeling of

11  their products, advertising and promotion of their products, disclosure or lack thereof of the risks

12  posed by their products, implementation or lack thereof of procedures to prevent their products

13  from transmitting AIDS, and shipment of their products overseas are located almost exclusively

14  in the United States. The vast majority of witnesses who will testify to these policies, practices,

15  and decisions are also located in the United States, and would not be subject to subpoena in other

16  countries. The expert witnesses likely to be presented by both Plaintiff and Defendants are also

17  located in the United States.

18       8.    Decedent Castro's available medical records have already been brought to

19  the United States and are being translated into English. In addition, witnesses to the Plaintiff's

20  and Decedent's damages and family members of the Plaintiff and Decedent are willing to travel

21  to the United States to testify.

22       9.    Plaintiff is informed and believes and upon such information and belief

23  alleges that Defendants' unlawful activity was carried out, in significant part, in the Central

24  District of California. Defendant BAXTER CORPORATION, and/or its HYLAND DIVISION,

25  had its main manufacturing plant in Glendale, California, in the Central District. HYLAND's

26  President, Medical Director, and Head of Donor Recruitment all had their offices in the Glendale

27  facility. Defendant BAXTER, and/or its HYLAND DIVISION, also recruited all their

28  homosexual donors from California, particularly from San Francisco and Los Angeles. All

1  Defendants obtained plasma from plasma collection centers located in San Francisco and

2  Oakland, California.

3         10.    Plaintiff is informed and believes and upon such information and belief

4  alleges that the evidence of Defendants' unlawful activity is located, in significant part, in the

5  Central District of California, where much of the unlawful activity was carried out.

6  **III.    PARTIES**

7         11.    Decedent Fabian Adolfo Castro was a citizen and resident of Argentina and

8  a hemophiliac who used Defendants' factor concentrate and was infected with HIV and

9  Hepatitis C as a direct and proximate result thereof, and contracted AIDS as a further result of his

10  exposure to Defendants' factor concentrate and/or as a result of Defendants' conspiracy.  His

11  death was a direct and proximate result of his exposure to Defendants' factor concentrate.

12         12.    Plaintiff Lelia Ines Bessone de Castro was the Decedent's mother, and is

13  the Personal Representative of and Successor in Interest to the Estate of the Decedent Fabian

14  Adolfo Castro.  She is also a resident and citizen of Argentina.  She has incurred time and

15  expenses caring for her ill son, has suffered loss of support and has suffered other damages as a

16  result of her son's factor concentrate induced viral infections and illnesses..

17         13.    Decedent Castro would not have chosen to have been treated with

18  Defendants' blood products had he known of or been informed by Defendants of the true risks of

19  using those products or the nature of the sources of the blood products.

20         14.    Defendant CUTTER, the predecessor of Miles, Inc., and Defendant

21  BAYER, was a California corporation headquartered in Berkeley, California at all pertinent

22  times.  At all pertinent times CUTTER and its successors Miles, Inc. and BAYER regularly and

23  systematically engaged in the harvesting and collection of human plasma and the processing,

24  manufacturing, marketing, sales and distribution of anti-hemophilic factor (hereinafter referred to

25  as "AHF") produced from such plasma, to which Decedent was exposed and which contributed

26  directly or indirectly to Decedent's infection with HIV and/or HCV.

27         15.    Defendant BAYER, formerly Miles, Inc., is and was an Indiana

28  corporation, authorized to do business in all 50 states and the District of Columbia.  Miles, Inc.

725507.1                            - 5 -                    COMPLAINT FOR DAMAGES AND INJUNCTIVE
                                                            RELIEF AND DEMAND FOR JURY TRIAL

1  had its principal place of business operation in Elkhart, Indiana, while its successor BAYER has

2  its principal place of business in Pennsylvania, with offices located at 100 Bayer Road,

3  Pittsburgh, Pennsylvania 15205. At all pertinent times BAYER and its predecessors Miles, Inc.,

4  and CUTTER regularly and systematically engaged in the harvesting and collection of human

5  plasma and the processing, manufacturing, marketing, sales and distribution of anti-hemophilic

6  factor (hereinafter referred to as "AHF") produced from such plasma, to which Decedent was

7  exposed and which contributed directly or indirectly to Decedent's infection with HIV and/or

8  HCV.

9          16.    Defendant BAXTER HEALTHCARE CORPORATION (hereinafter

10  "BAXTER") is a Delaware corporation, authorized to do business in all 50 states and the District

11  of Columbia, with its principal place of business in Illinois, with offices located at One Baxter

12  Parkway, Deerfield, Illinois 60015. At all times pertinent, Defendant BAXTER, and/or its

13  HYLAND DIVISION, had its main manufacturing plant in Glendale, California. In 1997,

14  BAXTER acquired all assets and liabilities of Immuno International A.G., an Austrian company

15  that at all times pertinent sold AHF products worldwide which were produced from human

16  plasma derived from paid donors in the United States. Immuno International A.G. operated in the

17  United States at all times pertinent through its wholly owned American subsidiary Immuno-U.S.,

18  located in Rochester, New York. At all times pertinent, Defendant BAXTER, and/or its

19  HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol Laboratories and Fenwal

20  Laboratories, regularly and systematically engaged in the harvesting and collection of human

21  plasma and the processing, manufacturing, marketing, sales and distribution of AHF products

22  produced from such plasma, to which Decedent was exposed and which contributed directly or

23  indirectly to Decedent's infection with HIV and/or HCV.

24          17.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC. is a

25  Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with

26  its principal place of business in Pennsylvania, with offices located at 500 Arcola Road, P.O.

27  Box 1200, Collegeville, Pennsylvania 19426-0107. In 1996 Defendant ARMOUR merged with

28  Behringwerke A.G., a German company that at all times pertinent sold AHF products which were

1    produced from human plasma derived from paid donors in the United States, to form Defendant

2    AVENTIS BEHRING LLC, formerly Centeon Bio-Services, Inc., a Delaware company with

3    offices located at 1020 First Avenue, King of Prussia, Pennsylvania 19406.  Defendant AVENTIS

4    BEHRING LLC and its predecessors, Centeon Bio-Services, Inc. and Armour Plasma Alliance,

5    Inc., are wholly owned subsidiaries of Defendant AVENTIS INC., formerly Rhone-Poulenc

6    Rorer International, Inc., formerly Rorer Group, Inc., a Pennsylvania corporation authorized to do

7    business in all 50 states and the District of Columbia, with offices located at 300 Somerset

8    Corporate Boulevard, Bridgewater, New Jersey 08807.  At all times pertinent, Defendants

9    ARMOUR PHARMACEUTICAL COMPANY, INC., AVENTIS BEHRING LLC, and

10   AVENTIS INC. (all of whom are described hereinafter collectively as "ARMOUR"), regularly

11   and systematically engaged in the harvesting and collection of human plasma and the processing,

12   manufacturing, marketing, sales and distribution of AHF products produced from such plasma, to

13   which Decedent was exposed and which contributed directly or indirectly to Decedent's infection

14   with HIV and/or HCV.

15        18.    Defendant ALPHA THERAPEUTIC CORPORATION (hereinafter

16   "ALPHA") is a California corporation authorized to do business in all 50 states and the District of

17   Columbia, with its principal place of business in California, with offices at 5555 Valley

18   Boulevard, Los Angeles, California 90032.  ALPHA is a wholly owned subsidiary of The Green

19   Cross Corporation (hereinafter "Green Cross"), a Japanese business corporation.  At all times

20   pertinent Defendant ALPHA and its parent, Green Cross, have been regularly and systematically

21   engaged in the harvesting and collection of human plasma and the processing, manufacturing,

22   marketing, sales and distribution of AHF products produced from such plasma, to which

23   Decedent was exposed and which contributed directly or indirectly to Decedent's infection with

24   HIV and/or HCV.

25        19.    Defendants CUTTER, ARMOUR, BAXTER and ALPHA (hereinafter

26   collectively referred to as "MANUFACTURERS") acting on behalf of themselves and/or their

27   predecessor and/or successor corporations, collected, harvested and/or processed human plasma

28   and/or manufactured, marketed, sold and distributed AHF products worldwide that were

1  contaminated with HIV and/or HCV. In the alternative, one or more of said Defendants

2  participated in the collection, harvesting and/or processing of human plasma and/or the

3  manufacturing, marketing, distribution and sale of AHF products worldwide, or assumed, became

4  or are responsible for the liabilities of the Defendants and their predecessor or successor

5  corporations who did participate in the collection, harvesting and/or processing of human plasma

6  and/or the manufacturing, marketing, distribution or sale of AHF products worldwide, without

7  limitation thereto.

8         20.    At all times herein mentioned, all Defendants and each of them, were fully

9  informed of the actions of their agents and employees, and thereafter no officer, director or

10  managing agent of Defendants repudiated those actions, which failure to repudiate constituted

11  adoption and approval of said actions and that all Defendants and each of them, thereby ratified

12  those actions.

13  **IV.    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

14         **A.    Hemophilia and Its Treatment**

15         21.    Hemophilia is an inherited condition that causes uncontrolled

16  hemorrhaging or bleeding. Hemophilia results from a deficiency of blood components essential

17  for coagulation. The most common form of the disease is hemophilia A, characterized by a lack

18  of a blood protein known as Factor VIII, which affects approximately one in 10,000 males.

19  Factor VIII is commonly called "AHF," or antihemophilic factor. Hemophilia B is characterized

20  by absence of another blood protein, known as Factor IX, affecting about one in 40,000 males.

21  Von Willebrand's disease is an inherited hemorrhagic condition similar to hemophilia that affects

22  both men and women. It is characterized by lack of both Factor VIII and another blood protein

23  called von Willebrand's factor.

24         22.    The treatment of hemophilia and von Willebrand's disease involves

25  intravenous introduction, called infusion, of the missing blood proteins required to stop bleeding.

26  The two most prevalent forms of such treatment are cryoprecipitate, and factor concentrates.

27  Factor concentrates are the product made by Defendants in this action. Cryoprecipitate is made

28  by freezing plasma, the fluid component of circulating blood in which various proteins, including

1  Factor VIII and Factor IX, are contained; thawing the frozen plasma; and isolating Factor VIII

2  from the plasma through centrifugal concentration. Cryoprecipitate is an effective therapeutic

3  agent for patients with hemophilia A. Hemophilia B has been effectively treated with the use of

4  fresh frozen plasma containing Factor IX. Cryoprecipitate and fresh frozen plasma are made

5  from small numbers of donors, who are generally unpaid volunteers.

6        23.    By contrast, Defendants in the late 1960s to early 1970s began to market

7  factor concentrates, or AHF, which contained Factor VIII and Factor IX in higher concentrations

8  than had been available in either cryoprecipitate or fresh-frozen plasma. To produce factor

9  concentrates, Defendants mixed pools of plasma from five to twenty thousand donors at a time, a

10  substantial percentage of which were paid donors. These large pools were then subjected to

11  chemical process to concentrate Factors VIII and IX.

**B.    Even Before the Discovery of HIV and AIDS, Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

14        24.    Shortly after the initial commercial marketing of Factor VIII and IX

15  concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were

16  reported in association with these products. Even before the dissemination of HIV, Defendants

17  knew of serious diseases caused by unidentified agents transmissible by blood and Factor VIII

18  and IX. Defendants failed to warn Plaintiff or Decedent or the medical community of these

19  adverse effects, in violation of industry standards and federal regulations.

20        25.    By 1976, only a few years after Defendants' factor concentrate products

21  went on the market, the United States Food and Drug Administration ("FDA") Bureau of

22  Biologics held a conference entitled "Unsolved Therapeutic Problems in Hemophilia." The

23  research articles compiled from the conference discussed the high incidence in patients using

24  Defendants' products of disorders such as liver dysfunction, enlarged spleen, Hepatitis B, and

25  Non-A, Non-B Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded

26  that these disorders were tied to the patients' use of factor concentrates, and emphasized the risks

27  entailed in producing such concentrates using plasma from paid donors. For instance, Robert

28  Gerety of the FDA Bureau of Biologics, Division of Blood and Blood Products, reported that the

1    agent or agents of NANB Hepatitis "appear to be blood borne, perhaps to be associated with a

2    form of chronic hepatitis, and to represent a considerable risk to recipients who repeatedly require

3    the administration of blood products." (Gerety, et al., "Viral Antigens and Antibodies in

4    Hemophiliacs," (1)77). Gerety noted that "[t]he use of large plasma pools from paid donors no

5    doubt contributes to the risk of HBV [Hepatitis B] infection from these products," and stated that

6    "an all voluntary blood donor system is being pursued as a result of the known increased risk of

7    PTH [post-transfusion hepatitis] from blood derived from commercial donors." As described

8    below, however, Defendants not only refused to implement such a voluntary donor system, but

9    instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from

10   which Defendants could make other commercially valuable products as well.

11           26.     Several of the articles from the 1976 conference also raised alarm over the

12   unprecedented convergence of immune disorders in the hemophiliac community, and called for

13   close medical monitoring of the situation. Dr. Peter Levine stated, "one wonders whether our

14   patients are suffering a sort of immune complex disease as a result of intensive bombardment

15   with foreign antigens...." (Levine, "Unsolved Problems with Current Therapeutic Regimens for

16   Hemophilia," (1977)). Shapiro warned of the possibility that "a new spectrum of disease may be

17   seen in this population" and urged that it "behooves us to follow the suggested findings very

18   closely over the coming years." (Shapiro, "Antibody Responses in the Hemophiliac," (1977)).

19   Seeff concurred that "it is evident that continued surveillance of the hemophiliac population is

20   mandatory." (Seeff, "Acute and Chronic Liver Disease in Hemophilia," (1977)).

21           27.     At all times material to this Complaint, Defendants failed to adequately

22   warn Plaintiff or the Decedent or his physicians of these serious adverse side effects. Several such

23   adverse effects, including immunosuppression (suppression of the immune system) were not

24   mentioned at all in the Defendants' package inserts, which were required to disclose adverse

25   reactions pursuant to federal statutes and regulations and applicable standards of care. Although

26   Defendants' inserts mentioned a risk that plasma "may" contain the causative agent of viral

27   hepatitis, the warning was seriously deficient in that: (a) Defendants failed to disclose that the

28   risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk donors

and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b) while "hepatitis" simply means inflammation of the liver, and may be a relatively benign, temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their products were believed to present a considerable risk of severe liver damage, cirrhosis, and significantly elevated risk of cancer; (c) Defendants misleadingly stated that the source plasma used in preparation of the product had been found to be non-reactive for Hepatitis B surface antigen (HBsAg)-implying that no viral hepatitis was present in the plasma-and falsely stated that available methods were not sensitive enough to detect all units of potentially infectious plasma, while failing to disclose that Defendants had refused to implement the more sophisticated Hepatitis B Core Antibody (HBc) test which would have excluded essentially all plasma contaminated by Hepatitis B; and (d) Defendants' labeling disclosed that the product was made from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk of disease, and that the particular groups of paid donors targeted by Defendants were known to be the highest risk groups available.

**C.    Defendants Recruited Plasma Donors from High Risk Populations to Manufacture Factor VIII and IX**

28.    The demand for and supply of anti-hemophilia factor rapidly increased during the 1970's, with the commercially-manufactured concentrate accounting for a large proportion of the increase in supply.  In 1977, a federal report projected that the volume of AHF manufactured would increase substantially by 1980. ("Study to Evaluate the Supply-Demand Relationships for AHF and PTC Through 1980," Division of Blood Diseases and Resources, National Heart, Lung and Blood Institute (1977), at page 8; hereinafter "NHLBI Report").

29.    In order to sell more AHF to this growing market, Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors.  Defendants recruited paid donors from those populations most likely to respond to the financial incentive to donate: poor inner city residents, drug abusers, prisoners, and even residents of impoverished developing countries such as Haiti and Nicaragua.

30.    Defendants purposefully sought out paid donors despite knowing that the

COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF AND DEMAND FOR JURY TRIAL

risk of diseases transmissible by blood was far greater among paid donors than among volunteers. Because no test was available yet for the NANB Hepatitis virus identified in the early 1970's, the only means to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors that were inconsistent with good health-precisely those populations from which Defendants were recruiting paid donors. Some studies indicated that paid donors were up to ten times more infectious than volunteer donors. For this reason, the National Blood Policy, adopted by the federal government in July 1973, advocated conversion to an all-volunteer blood supply. Defendants, however, not only continued to use paid donors, but also focused their recruiting efforts on the highest risk populations.

   31. Defendants had an additional financial incentive for recruiting paid donors. Factor VIII and Factor IX are only two of many products that can be made for commercial sale from human plasma. According to the NHLBI Report, by the late 1970s at least 17 different therapeutic components of blood were manufactured by the process of "fractionating" plasma into its various elements. The NHLBI Report noted that, "as the costs of fractionation have increased, fractionators have produced as many products as possible from a liter of plasma." (Id. at 65).

   32. Blood derivatives used as vaccines or therapeutics had particularly high economic value for Defendants. The NHLBI Report noted that plasma with a very high titer, or antibody level, for a corresponding antigen is "very expensive." (Id. at 41). Such products are manufactured from source plasma drawn from donors who have been sensitized to a particular antigen. (Id.). The NHLBI Report specifically stated, however, that "plasma collected for high antibody titer cannot be used for fractionation into therapeutic products," such as Defendants' factor concentrate. (Id., emphasis added).

   33. Defendants targeted donors with high titers to Hepatitis B antigens in order to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary immunity to the Hepatitis B virus. Despite the warning in the NHLBI report, Defendants used the same high titer plasma they obtained for making HBIG to manufacture the Factor VIII and IX products used by hemophiliacs. Defendants thus sought to maximize profits by producing "as many products as possible from a liter of plasma," while ignoring industry standards that

1    precluded the use of high-titer plasma for other therapeutic products.

2        34.    Beginning in about 1978, Defendants BAXTER, CUTTER and ALPHA

3    began targeting homosexual donors in known urban gay communities. Because urban

4    homosexuals had been reported in the 1970's to have exceptionally high prevalence of

5    Hepatitis B infection, Defendants knew that such donors would provide a reliable source of

6    plasma for the manufacture of commercially valuable HBIG.

7        35.    It was also well-known in the public health community by the 1970's that

8    urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other

9    diseases, including NANB Hepatitis, which were transmitted by blood, could not be isolated nor

10   identified, and were believed to have serious adverse consequences. Despite this knowledge,

11   Defendants used the same plasma pool from urban homosexuals to manufacture both HBIG and

12   Factor VIII and IX.

13       36.    Defendants continued this dual use of high risk plasma even after federal

14   reports warned of the rapid spread of fatal immunosuppressive disease among the same

15   homosexual population from which Defendants heavily recruited. On June 5, 1981, the United

16   States Centers for Disease Control ("CDC") reported that five homosexual men had unusual and

17   similar immunosuppressive disorders (Morbidity and Mortality Weekly Report, hereinafter

18   "MMWR," June 5, 1981, at p. 250). On July 3, 1981, the CDC reported similar diseases in 26

19   homosexuals, noting that all 12 patients tested for cytomegalovirus ("CMV") had evidence of

20   "past or present CMV infection," and that past infections with hepatitis "were commonly

21   reported." (MMWR, July 3, 1981, at p. 305). The CDC warned doctors to be alert for

22   "opportunistic infections associated with immunosuppression in homosexual men." (Id., at

23   p. 307). By August 28, 1981, less than two months later, the reported figure had grown to 108

24   cases and 40% fatalities; 94% of the 101 males were homosexual or bisexual (MMWR,

25   August 28, 1981, at p. 409). Based on this evidence and the high prevalence of hepatitis in the

26   same population, Defendants knew or should have known by no later than the summer of 1981

27   that urban homosexual males were not "suitable donors" within the meaning of federal

28   regulations and/or other applicable standards of care.

37.    By the 1970s, it was also well-established that plasma from prison populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of the concentration of intravenous (IV) drug users in prisons. By 1974, the alanine aminotransferase ("ALT") test was available to test for elevated levels of liver enzymes called SGOT that indicate the presence of hepatitis. Prisoners were associated with SGOT levels of over 60 Ns per ml, a level that increases the risk of Hepatitis C transmission by a factor of 6. Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff or the Decedent, his physicians, or the FDA.

38.    On June 11, 1982, the CDC reported that 281 homosexual men and 33 IV drug users had been diagnosed with similar immunosuppression and opportunistic infections, with a 43% fatality rate. Yet Defendants continued to recruit these high risk donors while concealing the risk from Plaintiff, Decedent, his physicians and the FDA. It is highly significant that only Defendants had knowledge of this risk; while the spread of disease in homosexuals and IV drug users became known to the FDA and the public, only Defendants knew that these very populations were target donors for plasma used to make Factors VIII and IX.

39.    At a July, 1982 meeting attended by Defendants, the CDC publicly reported the first three cases of opportunistic infections among individuals with hemophilia. All three were reported to be heterosexual males. The CDC reported that the clinical and immunologic features of the three patients were strikingly similar to those recently observed among homosexual males and heterosexual IV drug users, while noting that the hemophilia patients did not share the latter two groups' risk factors. The CDC stated, "Although the cause of the severe immune dysfunction is unknown, the occurrence among the three hemophiliac cases suggests the possible transmission of an agent through blood products." (MMWR, July 16, 1982, at p. 366).

40.    In light of Defendants' special knowledge of the disease patterns among urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX manufacture, Defendants had duties to: (a) promptly investigate the first reports of opportunistic

1  infections among urban homosexuals in 1981; (b) discontinue the practice of using such high risk

2  donors; (c) disclose the risk to Decedent, his physicians, and the FDA, including the ongoing risk

3  of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still

4  marketed to patients; (d) implement procedures to kill blood-borne diseases in the products; and

5  (e) recall existing products from distribution or further use. Instead, Defendants continued to

6  conceal their recruitment of high risk donors and resist warnings and recalls, and failed to

7  implement procedures to make their products safe.

8      **D.     Defendants Failed to Use the Available Hepatitis B Core (HBc) Test to
        Exclude Plasma from High Risk Donors**

9

10         41.    By no later than 1978, Defendants knew of the availability of a new test to

11  determine whether an individual had a history of viral Hepatitis, which would have disqualified

12  the donor from providing plasma for the manufacture of Factor VIII or IX. By testing a person's

13  serum for the presence of the core to the Hepatitis B antibody, a history of viral Hepatitis could be

14  verified. This was known as the "HBc test." Published, peer-reviewed literature shows that the

15  HBc test was in use by researchers to determine that homosexual AIDS victims had a history of

16  viral Hepatitis by no later than December 1981. (Gottlieb, et al., "Pneumocystis Carinii

17  Pneumonia and Mucosal Candidiasis in Previously Healthy Homosexual Men," NEW

18  ENGLAND JOURNAL OF MEDICINE 1981; 305:1425-1431).

19         42.    Use of the HBc test would have eliminated approximately 75% of

20  homosexual plasma donors and over 90% of promiscuous urban homosexuals. It would have

21  eliminated almost 100% of intravenous drug users.

22         43.    Use of the HBc and ALT tests by Defendants by 1981 would have

23  eliminated the vast majority of the transmitters of HIV and HCV from the blood and plasma pools

24  of the nation, before the height of the AIDS and Hepatitis C epidemics. If Defendants had

25  implemented this test in a timely manner, Decedent would never have been infected with HIV or

26  HCV or suffered from AIDS or Hepatitis C as a result of factor concentrate use.

27         44.    Decedent Fabian Adolfo Castro and thousands of other hemophiliacs

28  worldwide became infected by the AIDS and Hepatitis C viruses through repeated exposures

from blood products manufactured from large pools of plasma donors (5,000 to 40,000). If Defendants had used the HBc and ALT tests to decrease by 70% to 90% the number of HIV and HCV positive donors who went into a pool, the infectivity of the product would have decreased substantially. Consequently, the rate of infection of hemophiliacs would have slowed down enormously, and the medical and scientific community would have been given more time to react appropriately to the HIV and Hepatitis C epidemics.

45. As noted below, federal regulations required plasma donors to be in good health, and donors with a "history of viral Hepatitis" were by definition unacceptable as blood or blood plasma donors. Persons with a history of viral hepatitis were excluded not only because of the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous behavior of the prospective donor which carried the risk of transmitting other viruses in addition to hepatitis. A reasonable and prudent plasma fractionator would not accept a HBc positive donor and expect to be in compliance with federal regulations as of 1978.

46. After public reports of the first hemophilia AIDS cases in July 1982, government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to eliminate plasma contaminated by the transmitter of AIDS or Hepatitis C. HBc testing was also strongly suggested to Defendants by the CDC at a meeting of the United States Public Health Service ("PHS") on January 4, 1983. Despite this urging, Defendants continued to use contaminated plasma donations that would have been excluded by the HBc test and continued to conceal from Decedent, his physicians, and the FDA the dangerous practice of targeting donors at highest risk for the very diseases that disqualified their plasma. At a January 6, 1983 meeting of Defendants' trade association, the Pharmaceutical Manufacturer's Association, Defendants agreed not to implement the highly effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did little to screen out donors at high risk for AIDS and Hepatitis C transmission.

47. As late as December 13, 1983, years after the HBc test was available, a memorandum from CUTTER's responsible head Stephen Ojala to various CUTTER executives, reporting back on a meeting held by all Defendants, shows that all Defendants conspired to

1 | propose a "task force" to further study the use of HBc as an intentional, bad faith "delaying tactic
2 | for the implementation" of the test.

3 | **E.    Defendants Also Failed to Implement Available Heat Treatment and Solvent**
4 | **Detergent to Kill Blood Borne Diseases**

5 | 48.    In the late 1970s and early 1980s, it was recognized that viruses were in all
6 | AHF products, including Factor VIII and IX.  Heat treatment and solvent detergent was available
7 | at that time to eliminate many of these viruses, including HIV and HCV.  Defendants were
8 | required to take reasonable steps to eliminate contamination, but Defendants failed to utilize these
9 | available technologies to eliminate the viruses in a timely manner.

10 | 49.    The 1977 NHLBI Report noted that albumin, another plasma product, was
11 | "heat treated to remove almost all danger of hepatitis." (Id., at p. 49). Defendant ARMOUR'S
12 | memorandum of June 1983 acknowledged that no cases of AIDS had been reported in heat-
13 | treated albumin users, but misleadingly states that heat treatment of Factor VIII and IX was not
14 | yet feasible.  It was clearly known by no later than 1977 that heat treatment was an effective way
15 | to make blood products safer, but Defendants wrongfully refused to implement such procedures
16 | as to Factor VIII and IX.  In 1995, the National Institutes of Health Institute of Medicine ("IOM")
17 | issued a report on the hemophilia AIDS epidemic which concluded that defendants "did not
18 | seriously consider alternative inactivation processes," including heat treatment, and that "heat
19 | treatment processes to prevent the transmission of hepatitis could have been developed before
20 | 1980." Heat treated, HIV-safe factor concentrates were not introduced by any Defendant until
21 | 1983, and were not universally in use until 1985.

22 | 50.    In addition to heat treatment, solvent detergent treatment was available to
23 | Defendants by the late 1970's as a simple and effective method of eliminating viruses in their
24 | factor concentrate products.  Solvent detergent effectively kills viruses such as HIV and HCV by
25 | destroying the viruses' lipid envelope.  It is simpler than heat treatment, and unlike heat treatment
26 | does not interfere with the Factor VIII and IX proteins needed for blood clotting.

27 | 51.    Solvent detergents were well-known, commercially available products as
28 | of the 1970's, and studies in which solvent detergent treatment was used to disrupt viruses were

1    published in the 1970's in peer-reviewed journals.  In 1980, Dr. Edward Shanbrom, a former

2    BAXTER scientist, received a patent for a solvent detergent treatment process for viral

3    inactivation of factor concentrate.  Dr. Shanbrom describes the implementation of this process as

4    "as easy as washing your hands."

5            52.    After receiving the patent, Dr. Shanbrom approached all four Defendants

6    about implementing the solvent detergent method, but all four Defendants wrongfully refused to

7    implement the method.  With the exception of Defendant ARMOUR, Defendants refused to even

8    commit any resources to investigate the method.  However, in June, 1985, the New York Blood

9    Center ("NYBC") obtained a license from the FDA to implement the process for Factor VIII.  The

10    NYBC obtained a license to use the process in 1987.  By 1987, all Defendants except ARMOUR

11    were using the process to virally inactivate their Factor VIII blood products.

12            53.    Although heat treatment was effective in destroying the HIV virus, it was

13    ineffective in destroying HCV and HBV.  A recent CDC study reported that "84% of previously

14    untreated patients infused with dry-heated Factor VIII products developed non-A, non-B hepatitis

15    ... several case reports of probable transmission of HBV and HCV through vapor heat-treated and

16    pasteurized products later appeared."  (Risk Factor for Infection with HBV and HCV in a Large

17    Cohort of Hemophiliac Males: Soucie, Richardson, Evatt et al; Transfusion, 2001; 41:338-343)

18            54.    The same CDC study reported that "solvent detergent treatment of blood

19    components found to be more effective against enveloped viruses than heat treatment ... No cases

20    of HBV, HCV, or HIV transmission through solvent detergent virus inactivated products have

21    been found in prospective studies of previously untreated patients..."

22            55.    The study further reported "in our data, the first dramatic decline in HCV

23    prevalence appears in the 1987 birth cohort.  The drop in HCV transmission correlates with the

24    licensing of solvent detergent treatment of factor IX products in 1987.  In addition, this cohort

25    would have been the first to benefit from the screening of blood donors using the surrogate

26    markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated with

27    a markedly decreased risk of HCV infection from blood transfusions."

28            56.    The study states further that "the residual transmissions after 1987 possibly

1  represent the use of product already manufactured or product manufactured during the interval

2  required to implement the new technology.  The 18-month shelf life of factor concentrates placed

3  those hemophiliacs born as late as 1989 at risk of infection."  The study goes on to recommend

4  testing for all hemophiliacs who received infusions of the defendant's blood products prior to

5  1992.

6        57.    The failure of Defendants to implement solvent detergent viral inactivation

7  techniques in a timely manner, to warn of the risk that heat treated Factor VIII and IX blood

8  products could transmit HBV and HCV, and to recall heat treated products that posed this risk

9  caused the needless infection of thousands of hemophiliacs with HCV and HBV after 1984.  Even

10  after Defendants knew or should have known that the solvent detergent process effectively

11  destroyed HCV and HBV, as well as HIV, they continued to sell heat treated Factor VIII and IX,

12  and refused to recall these dangerous products from the market.

13  **F.**    <u>**Defendants Continued to Ship Non-Heat Treated Factor Concentrate**</u>

14  <u>**Products Abroad Even After They Stopped Selling Non-Heat Treated**</u>
<u>**Product in the United States**</u>

15        58.    Between 1983 and 1985, Defendants stopped selling non-heat treated

16  factor concentrate in the United States and introduced a vastly safer heat-treated version.

17  However, one or more Defendants continued to ship their remaining stocks of non-heat treated

18  product abroad after ceasing sales of such product in the United States, despite knowledge that

19  the non-heat treated product was contaminated with HIV and/or HCV.

20        59.    According to a New York Times article entitled "2 Paths of Bayer Drug in

21  1980's:  Riskier Type Went Overseas," published on May 22, 2003, CUTTER, BAYER's

22  predecessor, sold millions of dollars of non-heat treated factor concentrate in Asia and Latin

23  America for over a year after introducing its heat-treated product in the United States in February,

24  1984.  According to the article, CUTTER records show that the company sought to maintain its

25  profit margin on "several large fixed-price contracts" in Latin America and Asia, and avoid being

26  stuck with old, unmarketable stock, by continuing to sell its cheaper-to produce non-heat treated

27  factor concentrate.  Minutes from a CUTTER meeting in November, 1984 stated that "there is

28  excess nonheated inventory," and that the company planned to "review international markets

- 19 - COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF AND DEMAND FOR JURY TRIAL

again to determine if more of this product can be sold."  The company pursued this strategy even

though, according to the Times article, CUTTER's manager for plasma procurement had

acknowledged in a letter in January, 1983 that "There is strong evidence to suggest that AIDS is

passed on to other people through ... plasma products," and despite its knowledge that the CDC

had reported in October, 1984 that 74 percent of hemophiliacs who used unheated product were

HIV positive.  The same CDC report indicated that a study done with CUTTER showed that heat

treatment rendered HIV "undetectable" in factor concentrate.

60.    According to the Times article, in late 1984 CUTTER told a Hong Kong

distributor interested in its new heat-treated product to "use up stocks" of its old, non-heat treated

product first.  CUTTER later assured the same distributor that the non-heat treated product posed

"no severe hazard."  In March 1985, a CUTTER report stated that "the Far East has ordered

400,000 units" and that "in Taiwan, Singapore, Malaysia, and Indonesia, doctors are primarily

dispensing nonheated Cutter" factor concentrate.  CUTTER did not apply for a license to sell its

new heat-treated product in Taiwan until July 1985, over a year after it began selling the new

product in the United States.  According to the Times article, over 100 hemophiliacs in Hong

Kong and Taiwan alone were infected with HIV by non-heat treated CUTTER product sold after

February, 1984.

61.    The March, 1985 CUTTER report additionally states that "Argentina has

been sold 300,000 units," according to the Times article.  A total of 100,000 vials, or $4 million

dollars worth, of non-heated CUTTER concentrate was shipped abroad after the company began

selling its heat-treated product in the United States.

62.    CUTTER's wrongful conduct in continuing to ship non-heat treated factor

concentrate abroad after ceasing sales of such product in the United States is typical of all

Defendants' wrongful conduct worldwide.  The Times article reports that upon learning of this

conduct in May, 1985, the FDA requested a meeting with Defendants to order them to comply

with their voluntary agreement to withdraw non-heat treated product from the market.  According

to the Times article, Dr. Harry M. Meyer, at that time the FDA's regulator of blood products,

stated in later legal papers that "[i]t was unconscionable for them to ship that material overseas."

**G.    Defendants Fraudulently Misrepresented the Safety of Factor VIII and IX and Concealed the Dangers of the Products**

63.    Defendants engaged in a pattern and practice of fraudulent concealment of their dangerous practices, fraudulent misrepresentations of the extent of their efforts to assure safety, and fraudulent misrepresentations that understated the risk of AIDS and Hepatitis C, in order to maintain profits from both factor concentrates and HBIG.  A summary of Defendants' fraudulent misrepresentations and concealment is set forth below.

64.    On July 27, 1982, a meeting of the Public Health Service was held as the result of the CDC's report of three hemophiliacs who contracted AIDS.  The responsible heads of ARMOUR, ALPHA, CUTTER and BAXTER were in attendance, along with officials from the National Hemophilia Foundation, CDC and FDA.  Three of the four Defendants were aware that they had used cryoprecipitate containing plasma from known, targeted homosexuals in the manufacture of Factor VIII and IX blood products.  These products had a shelf life of two and three years, respectively, and were either in production or already on the shelves in pharmacies waiting to be infused by hemophiliacs who purchased them.  The Defendants involved, CUTTER, BAXTER and ALPHA, failed to disclose these facts at the meeting where CDC officials Dr. Don Francis and Dr. Jeff Koplin were present, despite knowledge that the CDC's primary concern at that meeting was the infection of Factor VIII and IX by the transmitter of AIDS, which was already well-known to be epidemic in the targeted homosexual population.  (CUTTER memorandum dated August 3, 1982)

65.    In or about December, 1982, Rodell, the responsible head for BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would no longer use prison plasma in the production of factor concentrates.  In fact, BAXTER, unbeknownst to the FDA, continued to use prison plasma in factor concentrate production through October 1983.  (BAXTER memorandum dated October 20, 1983.)

66.    On January 5, 1983, an AIDS meeting was held at Children's Orthopedic Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States.  Representatives of all four Defendants were present at the meeting with treaters and patients.  The

1    purpose of the meeting was to have Defendants' representatives answer patients' questions about

2    AIDS transmission through factor concentrates. A patient asked representatives from CUTTER,

3    ALPHA, ARMOUR and BAXTER the following question: "Is the plasma from homosexuals,

4    prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?" No

5    Defendants admitted targeting or using plasma from homosexuals, prisoners or inner city IV drug

6    abusers. Dr. Goodman from BAXTER answered regarding BAXTER'S use of known

7    homosexuals as follows: "We are changing the nature of questions to homosexuals to the best of

8    our ability." CUTTER'S responsible head, Stephen Ojala, an ALPHA representative, and

9    ARMOUR'S Karl Hansen made no response to the question. This partial and misleading

10   response amounted to concealment of the true risk created by the use of known homosexuals, IV

11   drug abusers and prisoners in the manufacture of factor concentrates.

12          67.    At the January 5, 1983 meeting, and in the presence of the patients, one of

13   the treating physicians, Dr. Kasper, asked CUTTER'S Stephen Ojala: "These [plasma] centers

14   seem to be in rundown centers of town. Is there a move to move them to rural towns?" Ojala

15   answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti,

16   Seattle, Clayton, NC, and San Diego. We do not have centers in L.A. or San Francisco." This

17   answer was misleading because Ojala failed to state that CUTTER'S largest and first plasma

18   center was located at Arizona State Penitentiary. CUTTER also had a center at the Las Vegas

19   Prison. Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison

20   plasma, due to homosexual practices and drug abuse in the prison donor population. Many of

21   CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown

22   Oakland, California. CUTTER had also used plasma from centers which targeted known

23   homosexuals. In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a

24   center which targeted known homosexuals, because a donor was hospitalized with full blown

25   AIDS. The plasma was intended for Factor IX and HBIG production, but was not used because it

26   had thawed on the way to the processing plant. Upon receiving a report of this incident from

27   CUTTER, the FDA indicated a recall might have been necessary if the plasma had been

28   incorporated into factor concentrate final product. Ojala omitted any mention of these facts and

1  circumstances in his response to Dr. Kasper regarding the location of their plasma centers.

2  (CUTTER memorandum dated January 5,1983.)

3      68.    On January 14, 1983, Dr. Michael Rodell and the other responsible heads

4  from the four Defendants attended a meeting of the National Hemophilia Foundation ("NHF").

5  The purpose of the meeting was to have Defendants explain to the NHF what steps they were

6  prepared to take to safeguard the plasma supply from potential AIDS transmitters.  Defendants

7  were very concerned that the NHF would insist on a recommendation that HBc testing be

8  implemented, consistent with the CDC recommendation 10 days earlier.  BAXTER, under

9  Rodell's supervision, had already conducted a survey of several of their donor centers to

10  determine how many donors they would lose if the test were implemented.  BAXTER had

11  decided that up to 16% of their donors would not pass the test.  Further, BAXTER'S high titered

12  immunoglobulin donors would be eliminated.  In order to defer an NHF recommendation that

13  HBc testing be used, Rodell told NHF officials that surrogate testing was in the "R and D," or

14  "Research and Development," stage currently.  Rodell concealed the fact that the CDC had

15  strongly recommended use of the HBc Antibody test as a screening device for donors at high risk

16  for AIDS transmission.  The HBc Antibody test was not in the "R and D" stage, and was suitable

17  for use as a screening device for high risk AIDS and Hepatitis C donors.  In fact, the HBc test had

18  been approved in 1979 by the FDA as a diagnostic test to be used to ascertain a history of

19  previous hepatitis B infection, and as a screening device for blood and plasma donors.  The test

20  had the capability of identifying all donors with a history of viral hepatitis.  Donors with a

21  hepatitis history were specifically prohibited pursuant to the federal regulations (21 C.F.R.

22  § 640.63).  Rodell acknowledged that implementation of the HBc test would eliminate high

23  titered immunoglobulin donors, but failed to disclose that opposition to use of the test was based

24  on economic rather than safety concerns.

25      69.    At the January 14, 1983 meeting, ALPHA, CUTTER and BAXTER

26  concealed their advertising in publications distributed among urban homosexuals, for the specific

27  purpose of attracting them to plasma centers which supplied high titered plasma to the

28  Defendants.  CUTTER and ALPHA concealed their extensive use of prison plasma, and

BAXTER discussed plans to phase out prison plasma during the coming year. However, none of the Defendants revealed their "gentlemen's agreement" with the FDA to discontinue use of these plasma sources immediately. (CUTTER Memorandum dated January 17, 1983.)

70.    In response to the growing concern by hemophiliacs regarding reports in the lay press of AIDS transmission through blood products, CUTTER issued a press release dated January 28, 1983. The press release stated, "Cutter has intensively involved its people and resources to contribute to a resolution of this segment of the AIDS problem." This statement was false because CUTTER was, or had been, actively engaged in using the plasma of prisoners, known homosexuals and inner city IV drug abusers in the manufacture of factor concentrates. CUTTER had refused to comply with the CDC's recommendation to immediately implement the HBc test to screen out these high risk donors, and was engaged in a conspiracy with the other Defendants to conceal use of these donors in factor concentrates that were currently on the market. CUTTER had formed an alliance with the other three Defendants to avoid timely warnings, effective donor screening, and immediate recalls of high risk blood products. (ALPHA Memorandum dated January 20, 1983.)

71.    CUTTER published and distributed a magazine called ECHO, which was intended for patients, treaters and pharmacies. The May 1983 issue of ECHO Magazine was entitled, "Special AIDS Issue." In the introductory statement by CUTTER Medical Director Dr. George Akin, the following representation appeared: "We at Cutter want you to know that your welfare is our prime concern. We are doing everything possible to help researchers diagnose the syndrome as well as implement precautionary measures designed to minimize the risk for the person with hemophilia." This statement was false because:

a.    CUTTER had engaged in concerted actions with the other three companies to avoid recalls, timely warnings, appropriate HBc testing and screening of donors, and the flow of accurate information through the NHF. They were engaged in aggressive overpromotion of Factor VIII calculated to understate the risk of AIDS and Hepatitis C in order to increase sales, which had dropped due to information reported in the lay press regarding the risks of AIDS transmission. CUTTER, through its responsible head, Steven Ojala, was in the process

1   of organizing a coordinated legal defense plan to defend claims from AIDS victims they

2   anticipated as the result of their sales increases in 1983-84. In a January 1983 memorandum,

3   CUTTER discussed its plan to "refute links to AIDS."

4                  b.      CUTTER had failed to conduct any independent investigation into

5   any hemophiliac AIDS patient. CUTTER had been told by two of the foremost authorities in the

6   field, Dr. Lou Aledort and Dr. Peter Levine, that AIDS may be caused in hemophiliacs by foreign

7   proteins and alloantigens as well as unidentified viruses in the product, rendering continued use of

8   the products extremely dangerous. The product had been previously associated with chronic

9   active hepatitis, splenomegaly, lymphadenopathy, severe thrombocytopenia, T-cell abnormalities,

10  and high levels of circulating immune complexes. Older hemophiliacs were at increased risk for

11  full blown AIDS. These facts indicated that the more product infused, the higher the risk of

12  contracting AIDS.

13                 c.      Dr. Bruce Evatt of the CDC had informed CUTTER on March 15,

14  1983 that based upon the observed T-cell abnormalities in hemophiliacs, he expected one half of

15  them to develop full blown AIDS. The four fractionator Defendants were engaged in meetings

16  with the FDA with a common goal of averting a complete recall, the only responsible option

17  available to them.

18                 d.      CUTTER's Dr. Akin did not reveal that CUTTER was using or had

19  used a substantial amount of prison plasma, plasma from known homosexuals with a history of

20  Hepatitis B, and inner city dwellers with a high risk for intravenous drug abuse. These practices

21  exponentially increased the risk of AIDS and Hepatitis C, in direct contradiction to CUTTER's

22  misrepresentation that it was doing everything possible to minimize the risk.

23          72.     In the May 1983 issue of ECHO, CUTTER published an article entitled

24  "AIDS, the Unfolding Story," in which the following statement appeared: "In addition, NHF is

25  working collaboratively with the CDC on a nationwide epidemiologic survey of all hemophilia

26  treatment centers and affiliates, and has obtained special federal funding for AIDS research for

27  the CDC plus increased funding for NIH." This statement was misleading because it did not

28  reveal the fact that the epidemiologic survey by the CDC and the NHF demonstrated that heavy

1  users of Factor VIII were displaying severe immune abnormalities and T-Cell imbalances, while

2  cryoprecipitate users were not displaying these abnormalities. The article does not disclose that

3  the CDC considered these hemophiliacs to be at increased risk for AIDS because of the immune

4  abnormalities reported in the survey by December, 1982. The statement was also misleading

5  because the NHF was presented as an independent authority, when the NHF was essentially a

6  channel for industry views. In fact, a 1993 report by the U.S. NIH Institute of Medicine

7  concluded that the NHF had serious "conflicts of interest" precluding objective analysis because

8  of its "interdependence" with the Defendants.

9          73.    In the May 1983 ECHO article, CUTTER also understated the risk of

10  AIDS by presenting the view of Dr. Louis Aledort, Medical Co-Director of the NHF, and

11  hemophilia treater from New York's Mount Sinai Hospital. Dr. Aledort stated in the article, "Put

12  AIDS Disease in Perspective," as follows: "AIDS should not be viewed as a "panic signal" or a

13  reason to change a hemophilia patient's therapy." CUTTER chose to print this statement in

14  enlarged text. The statement was false and misleading because many physicians had in fact

15  already changed their patient's therapy based on scientific evidence of AIDS being cause by

16  Factor VIII and IX. There was substantial evidence to justify a change in therapy and a complete

17  recall of unscreened Factor VIII by May 1983.

18          74.    Dr. Aledort's article in the ECHO of May 1983 went on to state: "There is

19  no evidence to support that AIDS is transmitted in either cryoprecipitate or concentrate, although

20  it is possible." This statement was directly contrary to the evidence which led the Public Health

21  Service ("PHS") to conclude, following the January 4, 1983 CDC meeting, that donors at risk for

22  AIDS transmission should be screened to eliminate them from the blood supply. The statement

23  also ignores the March 24, 1983 PHS recommendations regarding mandatory screening

24  guidelines for blood and plasma donors to reduce the risk of AIDS transmission, because of the

25  evidence supporting transmission of AIDS in factor concentrate. It is also contrary to

26  Dr. Aledort's repeated assertions, in sworn testimony at trials and in depositions, that it was his

27  expert opinion that AIDS was transmitted through factor concentrates by repeated exposure to

28  foreign proteins and alloantigens in intermediate purity factor concentrates until 1984, when the

AIDS virus was isolated and identified. (ECHO Magazine, May, 1983 "Special AIDS Edition")

75.    CUTTER conducted an AIDS Forum in the Summer of 1983 at the World Hemophilia Federation Meeting in Stockholm, Sweden. CUTTER invited several hemophilia treatment experts to participate in the forum. CUTTER later published the statements made by some of the experts in a publication entitled "Cutter Forum: AIDS and Hemophilia Treatment." In the publication the following statements were selected by CUTTER for attribution to the experts: "The physician who wants to test a patient for AIDS runs the risk of putting the patient into a state of terror." "Many at the conference warned colleagues to avoid fueling patients' fears by giving them inconclusive data." "The major concern I have is that physicians or others who deliver healthcare will magnify the panic by telling patients they have 'pre AIDS' or AIDS, based on the methodology we have used for the last four or five years in defining T-Cell populations." Another M.D. added, "With the anxiety our fellow physicians are causing patients, we're going to see more fear of AIDS than actual cases of AIDS." The statements attributed to these "experts" are misleading. In fact there was no medical or scientific support for any of the anonymous conclusions stated by the "M.D.'s" in the article. By the summer of 1983, T-cell testing was sufficiently reliable to form the basis of numerous reliable studies and conclusions about AIDS in hemophiliacs and other risk groups. There was no scientific methodology to support the statement that the fear of AIDS would outnumber actual AIDS cases. Instead, CUTTER'S motive was to understate the risk and increase sales, while continuing to conceal the use of high risk plasma to manufacture Factor VIII and IX.

76.    The CUTTER 1983 "Forum" article also attributed the following statement to an "expert" treater: "A physician who has dealt with AIDS directly also doubted the validity of T-Cell tests." This statement was false because by the summer of 1983, T-cell abnormalities over time were a clear risk factor for AIDS. The article also stated, "Another M.D. added, 'I have to sit down individually with all the patients and discuss the AIDS problem with them. But I stress that I am not very concerned because the majority of our hemophiliacs are not affected by it." This statement was very misleading because the growing epidemiological evidence regarding AIDS in hemophiliacs clearly supported a substantial risk due to their extensive use of factor

1   concentrates, and Defendants knew of CDC projections that half of all hemophiliacs would

2   develop AIDS.

3         77.     The CUTTER 1983 "Forum" article went on to state: "One researcher put

4   the situation into perspective this way: 'The very essence of our treatment programs could

5   potentially be threatened by the fear of a disease that has not even killed ten hemophiliac people

6   since 1982... I had eight patients die of trauma and cerebral hemorrhage last year, and I didn't

7   have any die of AIDS. I think we have to remember that our patients are getting hit on the head

8   or mugged, that they're falling down stairs, they're bleeding to death, and that those problems are

9   much more immediate than anything having to do with AIDS.' This statement was misleading

10  because in the summer of 1983, CUTTER conducted an analysis which acknowledged the risk of

11  2,000 to 5,000 hemophiliac deaths in the United States due to AIDS transmission through factor

12  concentrates.

13        78.     The above statement is also misleading in that it perpetuated the false

14  dichotomy between the benefits of factor concentrate therapy and the risk of AIDS. In fact, the

15  benefits of such therapy could and should have been provided with little or no AIDS risk by

16  avoiding use of high risk homosexual and IV drug user donors, treating plasma to kill viruses, and

17  implementing the HBc test. This statement was also contrary to the medical, scientific and

18  epidemiological evidence in existence at the time of the conference seminar on July 1, 1983. The

19  risk of contracting AIDS was already close to one in 100 for severe type A hemophiliacs. If T-

20  cell abnormalities were taken into consideration, the risk was close to one out of two for heavy

21  users of the product. As noted previously, the CDC had predicted several months before the

22  CUTTER Forum was published that 50% of hemophiliacs would suffer from full blown AIDS.

23  (CUTTER document entitled "Cutter Forum, AIDS and Hemophilia Treatment" around July 1,

24  1983)

25        79.     In late October 1983, CUTTER was notified that a donor had died of AIDS

26  in Austin, Texas. The donor died within 30 days of his last donation. Because the donor's

27  plasma had been used in numerous lots of Factor VIII and IX over the previous two years, a recall

28  of those lots was ordered by CUTTER. On November 1, 1983, CUTTER issued a press release

1  regarding the recall.  The press release stated, "No adverse reactions involving these lots have

2  been reported."  This statement is misleading because it was virtually impossible for CUTTER to

3  know whether or not any adverse reactions had been experienced or reported to physicians by

4  patients who infused lots which contained plasma from the AIDS donor.  The withdrawal

5  pertained to several lots and involved the pooling of the AIDS donor's plasma in thousands of

6  doses of factor concentrate.  In fact, abnormal T-cell ratios had undoubtedly been reported in

7  some hemophiliacs who infused lots containing the AIDS donor's plasma, along with

8  lymphadenopathy and numerous other side effects associated with a pre-AIDS condition.

9          80.    CUTTER further stated in the November 1, 1983, press release, "Although

10  medical authorities consider the possibility of AIDS being transmitted through these products

11  exceedingly remote, CUTTER is taking the action on its own initiative as a precautionary

12  measure."  This statement is false because public health authorities from the CDC had advised

13  CUTTER on March 15, 1983 that they expected one-half of the hemophilia patients who had

14  infused these products to develop full blown AIDS.  CUTTER had been repeatedly advised by

15  public health officials that the AIDS observed in persons at risk for AIDS was only the "tip of the

16  iceberg."  CUTTER had conducted its own in-house investigations entitled "AIDS scenarios" and

17  concluded that a possible outcome would be full blown AIDS in 5,000 hemophiliacs in the U.S.

18  There was a public health consensus that hemophiliacs were one of the high risk groups for

19  contracting AIDS because of their use of Factor VIII.  CUTTER was within days of applying to

20  the FDA for a change to the labeling of Factor VIII that would include a stronger warning.

21  (CUTTER Press Release dated November 1, 1983)

22          81.    ALPHA published and distributed a newsletter in the summer of 1983

23  entitled "Hemophilia."  The newsletter contains the statement in an introduction by Thomas

24  Stagnaro, Marketing Head, that "[n]eedless to say, Alpha has stepped up efforts to protect

25  hemophilia patients, but new evidence suggests there is no proof that AIDS is necessarily

26  associated with blood or blood products."  This statement was misleading because it was contrary

27  to existing and accumulating scientific evidence demonstrating the associated risk between use of

28  Factor VIII and AIDS.  It was also contrary to the PHS guidelines and recommendations of

1    January 4 and March 24, 1983 mandating screening of high risk donors for AIDS.

2        82.    The ALPHA 1983 newsletter also stated: "There is some question as to

3    whether use of cryoprecipitate would actually be safer in any case." This statement was contrary

4    to the consensus that cryoprecipitate was safer because it was made from voluntary donors in

5    groups of 8 to 10, while ALPHA's product was made using pools of plasma from high risk paid

6    donors, with 5,000 to 40,000 donations in each lot. Immune abnormalities had been associated

7    with use of factor concentrates but not cryoprecipitate. Thus, there was no credible evidence

8    upon which to question the fact that cryoprecipitate was safer than factor concentrates.

9    (Hemophilia Letter, dated Summer, 1983, Vol. 5, No. 1.)

10        83.    ALPHA organized a seminar consisting of hemophilia treaters and

11    physicians from the CDC and NIH in connection with an American Blood Resources Association

12    ("ABRA") meeting held in Puerto Rico in March, 1983, called the "ABRA Plasma Form." All

13    Defendants were members of ABRA, and ABRA itself held meetings of Defendants for the

14    purpose of planning strategies to understate the AIDS risk. ALPHA published excerpts from the

15    1983 Forum which understated the risk of factor concentrate in comparison to other therapies,

16    such as the statement attributed to Dr. Lou Aledort of the NHF: "[M]ore recent, unpublished data

17    show that immune system abnormalities develop in hemophiliacs no matter what sort of treatment

18    they receive, concentrate or cryo, Factor VIII or IX, high doses or low, and whether they are

19    young or old, or whether their disease is mild, moderate or severe." Dr. Aledort also cautioned

20    that "measuring T-Cell changes is technically difficult, and that the methodology used in some

21    studies has been faulty." This statement was contrary to the medical and scientific evidence

22    existing at that time. Older, more severe hemophiliacs who had used more product were

23    demonstrating more severe immune abnormalities, as well as opportunistic infections. Factor

24    VIII users, who were exposed to greater quantities of concentrate, were more immune suppressed

25    than Factor IX users. Cryoprecipitate users had fewer immune abnormalities than concentrate

26    users.

27        84.    The 1983 ALPHA/ABRA Forum includes the following statement,

28    attributed to Dr. Nemo: "It is not at all clear, Dr. Nemo said, that an infectious AIDS agent, if

one exists, can be spread by blood products. The link between AIDS and its possible transmission by blood products is very tenuous indeed." This statement was demonstrably false by March, 1983, by which time the overwhelming scientific evidence supported the conclusion that AIDS was transmitted by blood products such as factor concentrates. (Highlights from the 1983 ABRA Plasma Forum, A Professional Service of Alpha Therapeutic Corporation, March 1983.)

85.    On or about December 15, 1983, Rodell, then the head of ARMOUR, told members of the federal Blood Product Advisory Committee (BPAC) and FDA officials that the Defendants wanted a three month deferral in implementation of any recommendations by the BPAC or FDA that HBc testing be required for plasma donors. Rodell told the FDA that the purpose of the deferral was to prepare a response to the proposed recommendation. In fact, all Defendants had agreed to seek the three month hiatus as a "delaying tactic" against implementing the test, and the request for a deferral was made in bad faith. (CUTTER memorandum dated December 13, 1983.)

86.    The September 1985 issue of ECHO magazine also contained a number of false and misleading statements. In the magazine, CUTTER stated, "The ability to screen donors was hampered by not knowing what caused the disease. However, as soon as it became known that there was a possibility of transmitting AIDS through blood products, Cutter Laboratories began to screen donors in an effort to exclude any who were in the high risk groups." This statement was misleading because there was no need to determine what actually caused Factor VIII to transmit AIDS in order for CUTTER to screen out donors who were at high risk for AIDS transmission. It was strongly suggested by the CDC on July 27, 1982, that AIDS had a viral etiology similar to Hepatitis B because of the risk groups involved. These risk groups comprised a substantial portion of CUTTER's plasma donor sources. CUTTER took no meaningful action to screen out donors at the highest risk for AIDS and Hepatitis C transmission at any time during the epidemic. In fact, they continued to market products containing plasma from these groups throughout 1982, 1983 and 1984 worldwide. Even more egregiously, CUTTER and other Defendants continued to market high risk non-heat treated factor concentrate abroad after ceasing

1    sales of such product in the United States in favor of vastly safer heat treated product.

2       87.    In the same issue of ECHO, Dr. Margaret Hilgartner, a hemophilia treater

3    from Cornell Medical Center presented by CUTTER, made the following statement understating

4    the risk of AIDS and exaggerating the need for factor concentrate products: "The current risk of

5    persons with hemophilia developing AIDS is directly related to their need for blood products to

6    stop bleeding. The risk is extremely low. Although most persons with hemophilia who have

7    been treated with concentrate and some who have been treated with cryoprecipitate have been

8    exposed to the virus in the past, less than .1 percent of the 20,000 persons with hemophilia in the

9    United States have developed AIDS." This statement was misleading for several reasons:

10       a.    The risk was very close to 1% for severe type A hemophiliacs, who

11    were the heaviest users and most likely to be exposed to HIV in Factor VIII. The CDC had

12    reported 71 cases in such persons by September 1985. Since there were approximately 8,000

13    severe, Type A Hemophiliacs using the product regularly, the risk was close to one in 100. A 1%

14    risk of contracting AIDS, a fatal disease, is not "low" as stated by Dr. Hilgartner. Dr. George

15    Akin, CUTTER's medical director, repeated this misrepresentation in his forward to the

16    Hilgartner article in the ECHO publication.

17       b.    The article did not disclose the report made by Dr. Evatt of the

18    CDC to the company at a March 1983 ABRA meeting, in which he projected that one half of all

19    hemophiliacs would get full blown AIDS based upon their known T-Cell abnormalities tied to

20    exposure to Factor VIII. (CUTTER memorandum dated March 14, 1983.)

21       c.    As they had done throughout, Defendants misleadingly represented

22    that the benefits of Factor VIII outweighed the risks of AIDS and Hepatitis C, when in fact the

23    benefits could and should have been provided with minimal risk through proper safety measures

24    and avoiding high risk donors.

25       88.    In the same issue of ECHO, Dr. Hilgartner further stated, "[A] positive test

26    result does not mean that the person will actually get AIDS." This statement was misleading

27    because there was no scientific basis for concluding in September 1985 that a positive ELISA

28    test, the then-existing test for the presence of HIV antibodies, did not mean eventual full blown

1  AIDS in the patient. In fact, severe T-Cell abnormalities and a positive ELISA test were reliable

2  predictors of full blown, and eventually fatal, AIDS.

3         89.    Dr. Hilgartner's article states, "There is no evidence to warrant changing

4  the current use of Factor VIII or Factor IX." This statement was also false. In fact, the evidence

5  was just the opposite. Non-heat treated, intermediate purity products were known by September

6  1985 to be contaminated with HIV by virtue of testing done at the CDC in the summer of 1984.

7  These tests demonstrated that 70% of type A severe and 40% of type B hemophiliacs were HIV

8  positive. In addition, Dr. Hilgartner had reported to the New York Academy of Sciences in 1983

9  that Factor VIII was associated with extremely serious side effects, including loss of

10 lymphocytes, thrombocytopenia, liver damage, renal failure, splenomegaly and abnormally high

11 levels of circulating immune complexes. Many of these same diseases were reported in

12 hemophiliac AIDS victims. Thus, there was strong medical and scientific evidence that continued

13 use of non-heat treated, intermediate purity factor concentrates should be avoided. (ECHO

14 magazine Vol. 6, No. 3, dated September 1985.)

15        90.    These facts demonstrate that Defendants, jointly and individually,

16 fraudulently misrepresented the risk of AIDS and Hepatitis C due to factor concentrates, failed to

17 disclose accurate warnings of the risk to Decedent or his physicians, and fraudulently purported to

18 be doing "everything possible" to improve safety, when in fact Defendants maximized the risk by

19 recruiting high risk donors and by resisting and obstructing HBc testing, heat treatment, and other

20 measures that would truly have reduced the risk.

21   **H.    Defendants' Activities Were Subject to Applicable Federal Regulations,**
22   **Which Evidences the Standard of Care With Which Defendants Should Have**
     **Complied**

23        91.    Blood derivatives such as Factor VIII and IX are prescription biologicals

24 subject to federal regulation as both "biological products" and "drugs." Public Health Service

25 Act, "Regulation of Biological Products," 42 U.S.C. § 262; Food, Drug & Cosmetic Act

26 ("FDCA"), 21 U.S.C. § 301, et seq.

27        a.    21 U.S.C. § 331(b) prohibited [should these be present tense

28 instead?] "adulteration or misbranding of any . . . drug, . . . ."

b.    21 U.S.C. § 51(a)(2)(B) provided that "[a] drug . . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety . . . ."

c.    21 U.S.C. § 352 provided that "[a] drug . . . shall be deemed to be misbranded . . . if its labeling is false or misleading in any particular."

d.    21 U.S.C. § 352(0(2) provided that a drug shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use . . . where its use may be dangerous to health."

e.    21 U.S.C. § 352(n) provided that a drug shall be deemed to be "misbranded" unless the labeling included information concerning side effects and contraindications as required in federal regulations.

f.    21 U.S.C. § 321(n) provided that if an article is alleged to be misbranded because the labeling or advertising is misleading, then the determination of whether the labeling or advertising is misleading shall take into account "not only representations made or suggested" by affirmative statements, "but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use" of the drug.

92.    At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided as follows, with respect to information to be provided with the sale of Defendants' products:

Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association with a drug; a causal relationship need not have been proved.

93.    At all times material to this Complaint, 21 C.F.R. § 200.5 provided as

follows:

> Manufacturers and distributors of drugs and the Food and Drug
> Administration occasionally are required to mail important
> information about drugs to physicians and others responsible for
> patient care. In the public interest, such mail shall be distinctive in
> appearance so that it will be promptly recognized and read.

94.    At all times material to this Complaint, Part 606 of 21 C.F.R. set forth "Current Good Manufacturing Practices" for biological products generally, and 21 C.F.R. § 640, et seq., set forth additional good manufacturing practices for blood and plasma biologicals.

95.    At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided:

> Laboratory control procedures shall include:  The establishment of
> scientifically sound and appropriate specifications, standards and
> test procedures to assure that blood and blood components are safe,
> pure, potent and effective.

96.    At all times material to this Complaint, 21 C.F.R. § 640.60 defined "Source Plasma (human)" as:

> The fluid portion of human blood which has been stabilized against
> clotting, collected by plasmapheresis, and is intended as source
> material for further manufacture into blood derivatives (a portion of
> pooled plasma separable by chemical means) intended for injection.

97.    At all times material to this Complaint, 21 C.F.R. § 640.63(c), entitled "Qualification of Donor," provided as follows with respect to donors of source plasma:

> Donors shall be in good health on the day of donation, as indicated
> in part by: . . . (9) freedom from any disease, other than malaria,
> transmissible by blood transfusion, in so far as can be determined
> by history and examination indicated in this section; (10) freedom
> of the arms and forearms from skin punctures or scars indicative of
> addiction to self- injected narcotics; (11) freedom from a history of

1    viral hepatitis; (12) freedom from a history of close contact within

2    six months of donation with an individual having viral

3    hepatitis; . . . .

4    Further, 21 C.F.R. § 640.63(a) provided that the method of determining "suitability of a donor"

5    included "tests" as well as the taking of a history and physical examination.

6        98.    At all times material to this Complaint, 21 C.F.R. § 606.140 provided as

7    follows:

8        Laboratory control procedures shall include:  (a) The establishment

9        of scientifically sound and appropriate specifications, standards and

10       test procedures to ensure that blood and blood components are safe,

11       pure, potent and effective.

12       99.    The foregoing statutes and regulations are evidence of the standard of care

13   Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX.

14   Defendants violated the foregoing regulations and/or failed to comply with applicable standards

15   of care by:  (a) marketing "adulterated" products that were unsafe as a result of failure to comply

16   with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were

17   misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse

18   reactions and potential safety hazards as soon as there was reasonable evidence of an association

19   with the product; (d) failing to exclude intravenous drug users who were unsuitable donors;

20   (e) failing to exclude donors with a history of viral Hepatitis who were unsuitable donors;

21   (f) affirmatively seeking out unsuitable donors known to have viral Hepatitis antibodies, as well

22   as prison populations known to include substantial numbers of intravenous drug users, for

23   inclusion of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to

24   disclose their use of dangerous donors; and (h) failing to use appropriate tests and/or procedures

25   to assure the products were safe.

26   **V.    CONSPIRACY, CONCERT OF ACTION AND GROUP LIABILITY**

27       100.    Defendants, and each of them, acted in concert and participated in a

28   conscious and deliberate conspiracy to act negligently, fraudulently and with willful and wanton

1  disregard for the rights and safety of blood product users, in connection with the manufacture of

2  Factor VIII and IX blood products and the collection of constituent plasma.

3       101.    After 1978, there were only four corporations in the United States engaged

4  in the production of Factor VIII and IX.  These four companies, Defendants herein, tacitly and

5  explicitly agreed to avoid upgrading industry standards.  For example, the technology to virally

6  inactivate factor concentrates existed in the early 1970s, but was not seriously investigated by any

7  of the Defendants until the early 1980s, despite its effective use in Europe.  Use of the HBc

8  antibody test to eliminate Hepatitis B carrier donors, and to identify donors with a history of viral

9  Hepatitis, was known science by 1978.  The HBc test was reported to be an effective surrogate

10  test for both AIDS transmission and NANB Hepatitis carriers by 1982, yet no Defendant

11  implemented this test until April 1984.

12       102.    Three of the Defendants, ALPHA, BAXTER and CUTTER, used donors

13  from predominantly homosexual donor centers, prisons, and inner city areas where the risk of IV

14  drug abuse was high.  After July 1982, when the results of this conduct culminated in reports of

15  fatal immune suppression in three hemophiliacs who infused the product, this concert of action

16  took on a more overt, active form.

17       103.    By December 1982, the FDA demanded that Defendants stop using

18  prisoners, donors from high risk areas for hepatitis and AIDS transmission, and known

19  homosexuals.  Rather than use good faith efforts to comply with the FDA requests, Defendants

20  collectively argued for a far less onerous and less effective donor screening program.  They

21  jointly proposed a system comprised of educating the donor by posting a placard in the donor

22  center stating who the risk groups for AIDS transmission were, and advising the donor that he

23  would be deferred if he acknowledged he was a member of one of those groups.  Later, he would

24  be required to fill out a questionnaire in private.  If he checked the box indicating he was in a high

25  risk group, he would be permanently deferred.

26       104.    At a January 6, 1983 meeting of Defendants' trade association, the

27  Biological Section of the Pharmaceutical Manufacturer's Association ("PMA"), Defendants

28  agreed not to implement highly effective HBc donor screening, instead selecting ineffective donor

1    questionnaires that did little to screen out donors at high risk for AIDS transmission. Defendants

2    further agreed to keep each other informed as to what the other was doing in order that a low

3    standard of care was maintained. HBc testing had been strongly suggested by the CDC at the

4    January 4, 1983 Public Health Service ("PHS") meeting. On January 14, 1983, Defendants acted

5    jointly to persuade the National Hemophilia Foundation ("NHF") not to advocate surrogate

6    testing for AIDS and Hepatitis C through implementation of the HBc test. Defendants persuaded

7    the NHF that use of the HBc test was in the "R and D" stage and not practical to implement at

8    that time.

9        105.    Defendants jointly agreed to oppose recall of the products beginning at the

10   January 6, 1983 meeting at the Pharmaceutical Manufacturers' Association ("PMA"). Beginning

11   with this meeting and continuing through at least July 19, 1983, Defendants met at various times

12   to prepare a strategy to prevent the FDA from advocating a far-reaching recall of factor

13   concentrate products. Defendants knew that due to their high risk donor populations, and their

14   combining of these donors in pools of 5,000 to 40,000, that their products were contaminated

15   with the AIDS agent. Nevertheless, Defendants acted in concert to lobby the FDA, to get the

16   FDA to issue recommendations to limit recalls to circumstances in which an identified donor had

17   died of AIDS within a specified time after the pooling of that donor's plasma. Defendants were

18   well aware that plasma from contaminated asymptomatic donors were mixed in the plasma pools

19   and contaminated virtually all lots. Defendants were successful in deferring any FDA Blood

20   Products Advisory Committee ("BPAC") recommendation for a general recall of the product at

21   the July 19, 1983 BPAC meeting. This joint action allowed the defendants to avoid ever recalling

22   any product except when a donor died of AIDS.

23       106.    Defendants conducted a meeting on or about January 6, 1983 at the PMA, a

24   major purpose of which was to decide on a unified strategy to deal with increasing knowledge of

25   risk of AIDS. At the meeting all four companies agreed to postpone submitting any request to the

26   FDA for permission to amend their warning labels or package inserts. They further agreed not to

27   apply to the FDA for warnings enhancements until the other three companies agreed to make

28   application for warning enhancements and to make the warnings similar in content. At the time

of the meeting, Defendants had been informed by various reliable health authorities, including the PHS, that there was evidence of an association of risk between factor concentrate use and the transmission of AIDS.

107.    On December 13, 1983, Stephen Ojala, CUTTER' s responsible head, documented by written memorandum that Defendants met and jointly agreed to propose a "study" of the HBc surrogate screening test, as a "delaying tactic" to avoid implementing the HBc test.

108.    Thereafter, at various times throughout 1983-1985, Defendants attended meetings or otherwise communicated to assure joint efforts to avoid recalling product; to avoid warning patients of the true risk; to market product when sales dropped due to information in the lay press related to AIDS transmission through factor concentrates; to avoid recall of non-heat-treated product after heat-treated products were available; to avoid implementation of the HBc test; and to coordinated a joint legal defense plan in anticipation of litigation from patients afflicted by AIDS through use of the products.  Defendants also operated through trade organizations, such as ABRA and PMA, to issue public statements minimizing the risks of AIDS and Hepatitis C and overpromoting the benefits of factor concentrate, to carry out the abovementioned goals of all Defendants.

109.    All of the Defendants likely to have caused the harm to Plaintiff and to Decedent are parties to this lawsuit and properly before the court.

110.    The conduct of each and all of the Defendants, with respect to their Factor VIII and Factor IX products and related plasma collection methods, was tortious.

111.    The harm which has been caused to the Plaintiff and Decedent resulted from the conduct of one, or various combinations of the Defendants, and, through no fault of the Plaintiff or Decedent, there may be uncertainty as to which one or combination of Defendants caused the harm.

112.    The burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by Plaintiff or Decedent.

113.    AHF was manufactured using the same fractionation method by all Defendants.  As such, during the relevant years from 1975 until 1985, factor concentrates were a

1   fungible product, and physicians prescribed the products interchangeably without regards to

2   brand names of the drugs.

3          114.   The factor concentrates manufactured by Defendants from 1975 until 1985

4   contained the same design flaws.  They were all manufactured from paid donor plasma, which

5   was at highest risk for Hepatitis B, Hepatitis C, and HIV viral transmission.  In addition, the

6   factor concentrate was made from large pools consisting of 5,000 to 40,000 paid donors, which

7   further magnified the risk of viral transmission.

8          115.   None of the factor concentrate was virally inactivated during this time

9   period.  Therefore, all of the AHF carried a significant risk of viral transmission.  In addition, all

10  of Defendants' factor concentrate products were similarly misbranded.  All of the products failed

11  to warn of the known risks enumerated in this complaint.

12         116.   In large part because of the fungibility of Defendants' factor concentrate

13  products, many hemophiliacs infused products from two or more of the Defendants during the

14  time period when all of the Defendants' products were infectious for HCV and HIV.  It therefore

15  may not be possible to determine which of the Defendants' products actually caused Decedent's

16  infection.  By suing the named Defendants, Plaintiff has joined all those manufacturers who could

17  have caused the infection with HCV and HIV.  Plaintiff alleges that Defendants have joint,

18  several, and alternative liability for Plaintiff's injuries.

19         117.   Plaintiff in this case will make all reasonable efforts through discovery and

20  use of experts to make a good faith determination as to which of the Defendants' product(s)

21  caused the Decedent's HCV and/or HIV infections.  However, if it is not possible to make such a

22  determination, Plaintiff respectfully requests that in the event that she prove that one or more

23  Defendants breached a duty to Plaintiff or Decedent that caused Decedent's infection with HIV

24  and/or HCV, but it cannot be proven which Defendants' product(s) caused this harm, the court

25  award damages consistent with each Defendant's market share at the relevant time.

26  **VI.   TOLLING OF APPLICABLE STATUTES OF LIMITATION**

27         118.   Any and all potentially applicable statutes of limitations have been tolled

28  by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and

1    misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation.

2    Such acts include but are not limited to intentionally covering up and refusing to disclose use of

3    high risk plasma; sale of products abroad known to be contaminated; suppressing and subverting

4    medical and scientific research; and failing to disclose and suppressing information concerning

5    the risks of HIV and HCV transmission from Defendants' contaminated factor concentrate.  For

6    example, while the spread of AIDS in homosexuals and IV drug users became known to the FDA

7    and the public, only Defendants knew that these very populations were the donors Defendants

8    were targeting to obtain plasma for their factor concentrate products.

9            119.    Defendants are estopped from relying on any statutes of limitation because

10   of their fraudulent concealment and misrepresentation alleged above.  Defendants were under a

11   duty to disclose the risks of HIV and HCV transmission from their contaminated factor

12   concentrate because this is nonpublic information over which they had exclusive control, because

13   Defendants knew this information was not readily available to Plaintiff or Decedent, and because

14   this information was relevant to Decedent in deciding whether to use Defendants' factor

15   concentrate.

16           120.    Until very recently, Plaintiff had no knowledge that Defendants were

17   engaged in much of the wrongdoing alleged herein.  Because of the fraudulent and active

18   concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts-

19   which continue to this day-to give Plaintiff the materially false impression that Defendants

20   undertook all feasible safety precautions to reduce the risk of HIV and HCV transmission from

21   their contaminated factor concentrate, Plaintiff could not reasonably have discovered the

22   wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken

23   legally effective action given the unavailability, until very recently, of internal memoranda and

24   other documents (as generally described herein) as evidence in support of Plaintiff's claims.

25   Defendants still refuse to admit and continue to conceal their wrongdoing, and therefore

26   Defendants' acts of fraudulent concealment and misrepresentation continue through the present

27   time.

28

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### NEGLIGENCE (SURVIVAL ACTION)

121.   Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further allege as follows:

122.   Defendants marketed their Factor VIII and/or Factor IX blood products to and for the benefit of Plaintiff's Decedent, and knew or should have known that Plaintiff's Decedent would use their Factor VIII and/or Factor IX blood products.

123.   Defendants owed Plaintiffs' Decedent duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

124.   Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, the Defendants breached their duties to Plaintiff' Decedent.  The following sub-paragraphs summarize Defendants' breaches of duties to Plaintiff's Decedent and describe categories of acts or omissions constituting breaches of duty by Defendants; each and/or any of these acts or omissions establishes an independent basis for Defendants' liability in negligence:

a.   Failure to exercise reasonable care in producing Factor VIII and Factor IX blood products that were free of viruses, including the HIV virus that causes AIDS and the HCV virus that causes Hepatitis C;

b.   Failure to exercise reasonable care in assuring that only suitable plasma would be used in manufacturing Factor VIII and Factor IX blood products;

c.   Failure to exercise reasonable care in testing plasma used in manufacturing Factor VIII and Factor IX blood products for virus contamination;

d.   Failure to exercise reasonable care in recruiting and screening donors of plasma used in manufacturing Factor VIII and Factor IX blood products;

e.   Failure to reasonably employ anti-viral techniques, including heat treating, in the manufacture of Factor VIII and Factor IX blood products;

f.   Unreasonable overpromotion of Factor VIII and Factor IX blood

1    products;

2                    g.      Understating the relative value of hemophilia treatments that

3    constituted alternatives to Defendants' Factor VIII and Factor IX blood products;

4                    h.      Failure to warn physicians, Plaintiff, and the hemophiliac

5    community of the dangers associated with Factor VIII and Factor IX blood products and/or the

6    viruses and foreign bodies contained within the plasma used in manufacturing Factor VIII and

7    Factor IX blood products;

8                    i.      Failure to exercise reasonable care by complying with federal

9    regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX

10   blood products.

11                   j.      Failure to exercise reasonable care in disseminating information

12   about Defendants' methods of manufacturing Factor VIII and Factor IX blood products and the

13   risks that were created by said methods; and

14                   k.      Failure to exercise reasonable care in recalling Factor VIII and

15   Factor IX blood products.

16          125.    Defendants knew, or should have known, that, due to their failure to use

17   reasonable care, Plaintiff's Decedent and other people with hemophilia, would use and did use

18   Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and

19   well-being.

20          126.    As the direct, producing, proximate and legal cause and result of the

21   Defendants' negligence, Plaintiff's Decedent suffered death

22          127.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

23   together with interest thereon and costs.

24          128.    Defendants' conduct, as alleged above, was malicious, intentional and

25   outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

26   conduct was directed specifically at Plaintiff's Decedent and was such as warrants an award of

27   punitive damages.

28          129.    The aforesaid cause of action has survived to the Plaintiff by virtue of the

1   California survival statute, CA Code of Civ. Proc., §377.20.

2   ## SECOND CLAIM FOR RELIEF

3   ## NEGLIGENCE PER SE (SURVIVAL ACTION)

4           130.    Plaintiff incorporates by reference all previous paragraphs of this

5   Complaint as if fully set forth here and further allege as follows:

6           131.    Defendants violated applicable federal statutes and regulations relating to

7   prescription drugs.  Plaintiff's Decedent was a person whom these statutes and regulations were

8   meant to protect.

9           132.    Defendants' violation of these statutes or regulations constitutes negligence

10  per se.

11          133.    Defendants' violation of these statutes or regulations was the direct,

12  producing, proximate and legal cause of Plaintiff's Decedent's injuries and damages. As the

13  direct, producing and legal cause and result of the Defendants' negligence, Plaintiff's Decedent

14  was injured and incurred damages, including but not limited to permanent physical injuries,

15  medical and hospital expenses in the past, past disability, past loss of use of the body, and past

16  physical and mental pain and suffering.

17          134.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

18  together with interest thereon and costs.

19          135.    Defendants' conduct, as alleged above, was malicious, intentional and

20  outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

21  conduct was directed specifically at Plaintiff and was such as warrants an award of punitive

22  damages.

23          136.    The aforesaid cause of action has survived to the Plaintiff by virtue of the

24  California survival statute, CA Code of Civ. Proc., §377.20.

25  ## THIRD CLAIM FOR RELIEF

26  ## FRAUDULENT OMISSION AND CONCEALMENT (SURVIVAL ACTION)

27          137.    Plaintiff incorporates by reference all previous paragraphs of this

28  Complaint as if fully set forth here and further allege as follows:

138.    Defendants had a confidential and special relationship with Plaintiff's Decedent due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII and Factor IX, (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible plasma collection practices; and (c) Defendants' direct communications with the hemophiliac community through newsletters that purported to accurately convey the risk of AIDS. As a result, Defendants had an affirmative duty to fully and adequately warn the hemophiliac community, including Plaintiff's Decedent and his physicians, of the true health and safety risks related to the Factor VIII and Factor IX blood products and constituent plasma and a duty to disclose their dangerous and irresponsible plasma collection practices.  Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of the products to Plaintiff's Decedent and his physicians.

139.    Misrepresentations made by the Defendants about the health and safety of their factor concentrate products independently imposed a duty upon Defendants to fully and accurately disclose to the hemophiliac community, including Plaintiff's Decedent and his physicians, the true health and safety risks related to Factor VIII and Factor IX and its constituent plasma and a duty to disclose their dangerous and irresponsible plasma collection practices.

140.    In connection with their Factor VIII and Factor IX products, Defendants fraudulently and intentionally concealed important and material health and safety product risk information from Plaintiff's Decedent, the hemophiliac community, and treating physicians, all as alleged in this Complaint.

141.    Any of the following is sufficient to independently establish Defendants' liability for fraudulent omission and/or concealment:

a.    Defendants fraudulently concealed the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

b.    Defendants fraudulently concealed their practice of using unsuitable plasma from unsuitable donors in the manufacture of Factor VIII and Factor IX blood products;

c.    Defendants fraudulently concealed their practice of avoiding the

1  use of available technology to detect viruses in Defendants' blood products and the components

2  thereof;

3         d.      Defendants fraudulently concealed their practice of avoiding the

4  use of available technology to destroy viruses in Defendants' blood products and the components

5  thereof;

6         e.      Defendants fraudulently concealed information about the known

7  comparative risks and benefits of the use of Factor VIII and Factor IX and the relative benefits

8  and availability of alternate products and therapies.

9         f.      Defendants knew that Plaintiff's Decedent, the hemophiliac

10  community, and his physicians would regard the matters Defendants concealed to be important in

11  determining their course of treatment, including their decision whether to use Factor VIII and/or

12  Factor IX.

13         142.    As a direct and proximate result of Defendants' fraudulent concealment

14  and suppression of material health and safety risks relating to Factor VIII and Factor IX and of

15  Defendants' dangerous and irresponsible plasma collection practices, Plaintiff and the Decedent

16  suffered and will continue to suffer injury, harm and economic loss. As the direct, producing,

17  proximate and legal cause and result of the Defendants' fraudulent concealment and suppression

18  of material health and safety risks relating to Factor VIII and Factor IX and of Defendants'

19  dangerous and irresponsible plasma collection practices, Plaintiff has been injured and has

20  incurred damages, including but not limited to the death of her decedent, medical and hospital

21  expenses in the past, past disability, Decedent's past loss of use of the body, past physical and

22  mental pain and suffering, and Decedent's loss of the enjoyment of life.

23         143.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

24  together with interest thereon and costs.

25         144.    Defendants' conduct, as alleged above, was malicious, intentional and

26  outrageous and constituted willful and wanton disregard for the rights or safety of others. Such

27  conduct was directed specifically at Plaintiff's Decedent and was such as warrants an award of

28  punitive damages.

145.    Plaintiff is informed and believes that Defendants utilize retention policies that provide for scheduled destruction of documents and other items, which may result in the knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and necessary to adjudication of this action, including, but not limited to, records identifying batch or lot numbers of Defendants' products shipped to particular treatment facilities abroad, which may facilitate product tracing. This risk warrants an order from this Court that such evidence (including all documents, data compilations, and tangible things within the meaning of Rule 26 of the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

146.    The aforesaid cause of action has survived to the Plaintiff by virtue of the California survival statute, CA Code of Civ. Proc., §377.20.

### FOURTH CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY (SURVIVAL ACTION)

147.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further allege as follows:

148.    Defendants' factor concentrate products were intentionally designed, manufactured, promoted, distributed and sold to be introduced into the human body.

149.    Defendants breached the implied warranties of merchantability and fitness because Defendants' factor concentrate products cannot pass without objection in the trade, are unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately packaged and labeled.

150.    The aforesaid cause of action has survived to the Plaintiff by virtue of the California survival statute, CA Code of Civ. Proc., §377.20.

### FIFTH CLAIM FOR RELIEF

### WRONGFUL DEATH

151.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further allegse as follows:

152.    Defendants marketed their Factor VIII and/or Factor IX blood products to and for the benefit of Plaintiff's Decedent, and knew or had reason to know of the defects in their

1    representative capacity, against all Defendants, jointly and severally, in an amount to be

2    determined at trial;

3            161.    For punitive and exemplary damages according to proof against all

4    Defendants;

5            162.    For an award of prejudgment interest, costs, disbursements and reasonable

6    attorneys' fees;

7            163.    For injunctive relief in the form of an order requiring Defendants to

8    preserve all relevant documents; and

9            164.    For such other and further relief as the Court deems equitable or

10   appropriate under the circumstances.

11

12

13   Dated: August 27, 2007          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

14                                   By:_____
15                                          Kent L. Klaudt

16                                   Elizabeth J. Cabraser, No. 083151 (ecabraser@lchb.com)
                                     Heather A. Foster, No. 184353 (hfoster@lchb.com)
17                                   Kent Klaudt, No. 183903 (kklaudt@lchb.com)
                                     Embarcadero Center West
18                                   275 Battery Street, 30th Floor
                                     San Francisco, California  94111-3339
19                                   Telephone:  (415) 956-1000
                                     Facsimile:  (415) 956-1008
20
                                     Steven E. Fineman, No. SF8481 (sfineman@lchb.com)
21                                   Nicholas R. Diamand, No. ND9701
                                     (ndiamand@lchb.com)
22                                   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                     780 Third Avenue
23                                   New York, NY 10017
                                     Telephone:  (212) 355-9500
24                                   Facsimile:  (212) 355-9592

25                                   Attorneys for Plaintiff
                                     LELIA INES BESSONE DE CASTRO
26

27

28

725507.1                    - 49 -              COMPLAINT FOR DAMAGES AND INJUNCTIVE
                                                RELIEF AND DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

COMES NOW PLAINTIFF LELIA INES BESSONE DE CASTRO and respectfully demand that the present matter be set for a jury trial.

Dated: August 2̶7̶, 2007                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _____
                                              Kent L. Klaudt

Elizabeth J. Cabraser, No. 083151 (ecabraser@lchb.com)
Heather A. Foster, No. 184353 (hfoster@lchb.com)
Kent Klaudt, No. 183903 (kklaudt@lchb.com)
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Steven E. Fineman, No. SF8481 (sfineman@lchb.com)
Nicholas R. Diamand, No. ND9701
(ndiamand@lchb.com)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue
New York, NY 10017
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Attorneys for Plaintiff
LELIA INES BESSONE DE CASTRO